UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TYLER A. MONTOUR,

Petitioner,

v. Case No. 19-C-1604

CATHY A. JESS,

Respondent.

---

**DECISION AND ORDER DENYING WRIT OF HABEAS CORPUS**

---

On September 30, 2015, a Walworth County jury found Petitioner Tyler Montour guilty of one count of attempted first-degree intentional homicide and one count of possession of a firearm by a felon in violation of Wis. Stat. §§ 939.32(1)(a), 940.01(1)(a), and 941.29(2). Montour was sentenced to 25 years of initial confinement and 15 years of extended supervision. The Wisconsin Court of Appeals affirmed his conviction, and the Wisconsin Supreme Court denied his petition for review. On November 1, 2019, Montour filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming that his Sixth Amendment right to the effective assistance of counsel was violated because his attorney unreasonably failed to argue for the lesser-included offense of first-degree recklessly endangering safety. Respondent moved to dismiss based on procedural default. Because the issues raised by Respondent's motion and the underlying merits were substantial, the Court appointed counsel. Respondent's motion to dismiss was denied, and the petition is now fully briefed and ready for decision. For the following reasons, the Court will deny Montour's petition for writ of habeas corpus.

## BACKGROUND

On June 23, 2015, Montour was charged with attempted first-degree intentional homicide and with possession of a firearm by a felon. The charges stemmed from an incident that occurred outside a Walworth County bar in the early morning hours of June 12, 2015. According to the complaint, Montour ran into Blake Kruizenga, Adrian Valadez, and Alex Valadez at the Hawk's Nest Bar in Delavan, Wisconsin. Montour bore some animosity toward Kruizenga and Adrian Valadez. Several years earlier, Kruizenga and Valadez had entered the home of Montour's sister and her husband, Pedro Gonzalez, while masked and armed, threatened them, struck Gonzalez in the head with a gun, and stole some "weed." Though charged with the home invasion robbery and various other crimes relating to the incident, a jury had acquitted Kruizenga of all charges except possession of a firearm by a felon. Dkt. No. 34-9 at 91:08–93:05; 196:05-09. Valadez entered a guilty plea to a theft charge. Dkt. No. 34-9 at 09-10. Montour was angry about the outcome.

While at the bar on June 23, 2015, Montour and Kruizenga briefly exchanged words in the restroom and, shortly thereafter, Montour left. Sometime thereafter, Kruizenga and Adrian Valadez left the bar and were standing outside. At some point, they saw a dark-colored sedan approach, leading them to believe that the driver of the vehicle intended to run them over. Kruizenga claimed that, as the vehicle drove by, Montour was hanging out the window, shouted a racial epithet at them, and fired multiple gunshots in their direction. Adrian Valadez likewise identified Montour as the shooter. As Kruizenga fled the scene of the shooting, he realized that he had been shot in the lower leg, although he did not suffer any serious complications as a result.

At trial, Montour was represented by Attorney Melissa Frost. Frost later testified that, from the outset, she and Montour had determined that they would proceed to trial. That decision was driven, in part, by Frost's belief that the State may have encountered difficulties securing the

cooperation of witnesses. Frost indicated that, at the time the case was filed, the State had not located Kruizenga, who had violated his probation by going to the bar with known felons. Frost filed a speedy trial demand, hoping to proceed to trial as quickly as possible and deprive the State of its key witnesses. There was also reason to believe the State's witnesses had serious credibility problems. In addition to the home invasion/robbery Kruizenga and Adrian Valadez had committed several years earlier, Kruizenga had nine prior convictions and had lied in his initial statements to his probation officer about his presence at the bar and his companions. Adrian Valadez was likewise on probation, had five prior convictions, and originally told police that another individual was driving a white car and that Gonzalez and Montour were both passengers. Gonzalez, as the actual victim of the crimes committed several years earlier by Kruizenga and Valadez, had at least as strong a motive as Montour to shoot at them. He also had seven prior convictions. Under these circumstances and given the evidence, Frost adopted a theory of defense that Montour was not the shooter.

Prior to trial, the State made an offer to Montour that in exchange for Montour pleading guilty to the lesser-included offense of first-degree recklessly endangering safety, the State would recommend ten years of initial confinement. Frost conveyed the offer to Montour but said that their discussion about it was "brief," noting that she indicated they had a strong case for acquittal and that the state court judge may not go along with the State's sentencing recommendation. Ultimately, she did "not encourage him to take the offer." Dkt. No. 34-12 at 23:14–15. Frost further stated that she told Montour that this was an exceptional case where "it might actually be better for us if we went to trial and lost at sentencing than if we didn't go to trial and proceeded to sentencing." *Id.* at 24:1–3. Montour rejected the State's offer and his case proceeded to trial.

On the morning of jury selection, Frost "still believed that the state's witnesses perhaps were not going to show up." *Id.* at 28:8–9. It became clear early on, however, that the State's witnesses would appear. During *voir dire*, the State noted that Kruizenga was sitting in the front row. And in opening argument, the prosecutor said the State would call Kruizenga, Adrian Valadez, Alex Valadez, and Pedro Gonzalez, the driver of the vehicle from which the shots were fired, to testify. Frost reserved her opening statement until she presented her case-in-chief.

Kruizenga took the stand first. He testified that he saw Montour hanging out the passenger window of a vehicle driving past him, heard him shout a racial epithet, and saw him fire several shots from a black handgun. Kruizenga stated that he was roughly ten to fifteen yards away from Montour when the shots were fired and that he could see down the barrel of the gun. The State then called Adrian Valadez. He corroborated Kruizenga's testimony and testified that he was at the bar when a vehicle drove toward them. Adrian saw Montour in the passenger seat of the vehicle, heard him shout a racial epithet, and witnessed Montour fire several shots in his general direction. Next on the stand was Alex Valadez. Alex corroborated the testimony of Kruizenga and Adrian concerning the confrontation between Montour and Kruizenga, where Kruizenga and Adrian were located during the shooting, and the fact that Montour was not present in the bar when he heard gunshots outside of the bar.

Pedro Gonzalez testified under a grant of immunity. Gonzalez stated that he picked up Montour from the bar and that Montour pointed to Kruizenga and Valadez and asked Gonzalez if he wanted to fight them. With Montour in the passenger seat, Gonzalez began to drive off. But Montour told Gonzalez to take a left down an alley, which took them toward Kruizenga and Valadez. As the vehicle passed Kruizenga and Valadez, Gonzalez heard gunshots coming from his right side, prompting him to quickly drive away. Gonzalez said that it was difficult to testify

against Montour because he had known him for more than ten years, he went to school with him, and Montour was the brother of his girlfriend.

Following the second day of the trial, Frost met with Montour. Montour told Frost that he wanted to take the stand and testify that he was a participant in the shooting. Specifically, Montour would have conceded that he was the shooter but that he only intended to scare Kruizenga and Valadez by shooting in their general direction. Frost "strongly encouraged" Montour not to testify because she believed that, if he did, "the trial was going to be over." *Id.* at 37:8–10. Frost indicated that she was still solely focused on the theory that Montour did not commit the crime.

The day after meeting with Montour, Frost gave her opening statement. Frost stated that the jury would hear from an investigator and from a few witnesses who would "kind of go through again some things that happened that night and some things that may have been said to the police." Dkt. No. 34-11 at 4:17–21. She emphasized that the defense would be brief. Frost recalled both Adrian Valadez and Kruizenga, both of whom again testified that they witnessed Montour fire a handgun in their direction. Montour expressly waived his right to testify.

During the jury instruction conference, the court raised the issue of whether it would be appropriate to instruct the jury on the lesser-included offense of first-degree recklessly endangering safety. Frost indicated that she did not want the jury instructed on the lesser-included offense, but that she did not have a "solid legal basis or really any legal basis for objecting to it." *Id.* at 65:18–19. As such, the Court instructed the jury on both attempted first-degree intentional homicide and first-degree recklessly endangering safety.

During closing arguments, the State emphasized much of what it had already demonstrated to the jury through each witness but further remarked that the jury was "not going to need" the first-degree recklessly endangering safety instruction because "you do not fire a handgun at

another human being from ten feet away with any other intention than to kill them." *Id.* at 93:17–25. Frost, on the other hand, stuck with her theory that Montour was not the shooter. In essence, Frost challenged the credibility of the witnesses who had identified Montour as the shooter. She noted the inconsistencies in their stories and argued that Kruizenga and Adrian Valadez had picked Montour as the shooter because they had seen him in the bar earlier that evening. She argued Gonzalez was intimidated by police. Frost did not address the lesser-included offense of first-degree recklessly endangering safety in her closing argument. After deliberating, the jury found Montour guilty of attempted first-degree intentional homicide and possession of a firearm by a felon.

Following sentencing, Montour was represented by Attorney Ann Auberry. Auberry filed a petition for a new trial pursuant to Wis. Stat. § 809.30 and asserted that Frost provided ineffective assistance of counsel by failing to argue in support of the lesser-included offense. In an accompanying affidavit, Montour stated that Frost told him that a jury "would never convict" him on the charge of attempted first-degree intentional homicide and that they never discussed the possibility of pursuing the lesser-included offense. Dkt. No. 34-12 at 73:1–4. The trial court proceeded to hold a *Machner* hearing to further develop these assertions.

At the hearing, Frost criticized her own performance during Montour's trial. She noted that she was not thinking as clearly as she normally would and, at one point, was admonished by the judge in front of the jury. Frost was also asked whether she considered changing her strategy after each of the State's witnesses appeared and testified. In response, Frost stated that she did not and that it "never even crossed [her] mind" to change her strategy and argue for the lesser-included offense. She also indicated that she had never discussed the possibility with Montour. *Id.* at 33:2.

Ultimately, Frost indicated that her strategy was a "bad decision" and that she should have talked to Montour more about the strategy when he indicated his desire to testify. *Id.* at 40:18–20.

The trial court denied Montour's motion. It found that Frost "engaged in deliberate trial strategies based on the circumstances, the facts of the case, the discussions that she had with the defendant before trial and her own experience which she has 17 years as an attorney, 10 primarily as defense counsel." Dkt. No. 34-13 at 13:8–12. The trial court remarked that the case was "a defense attorney's dream" because of the ability to discredit the witnesses and victims, even if they were cooperative with the State. *Id.* at 13:13–20. It also stated that Frost was not deficient by failing to argue for the lesser-included offense. The trial court further noted that the defense was "going for all or nothing" and that Montour chose not to take the plea agreement offered by the State before trial. *Id.* at 15:1–4. The court concluded Frost's performance was not deficient, noting:

> [The case] looked like, at the time, a great case for being able to show reasonable doubt or be able to show that the State cannot make their case beyond a reasonable doubt. I find that their strategy and her decision to use that strategy as counsel was reasonable given the facts that they knew at the time. I definitely find it was within the range of professionally competent assistance.

Dkt. No. 34-13 at 13:21–14:02.

The Wisconsin Court of Appeals affirmed. Dkt. No. 34-5. The Wisconsin Court of Appeals recited many of the trial court's findings and ultimately concluded that Frost did not perform deficiently. *Id.* at ¶ 16. The court noted that Frost "developed and pursued a strategy that Montour was not the shooter" and that Montour "chose to pursue that strategy while withholding crucial information that undermined that strategy," namely, that he was the shooter. *Id.* The Wisconsin Court of Appeals, citing state law, stated that Montour could not "create his own error by deliberate choice of strategy and then ask to receive benefit from that error on appeal." *Id.*

(citing *State v. Gary M.B.*, 2004 WI 33, ¶ 11, 270 Wis. 2d 62, 676 N.W.2d 475 (internal quotation marks omitted)). Having concluded that Frost did not perform deficiently, the court declined to consider whether Montour was prejudiced. *Id.* at ¶ 17. The Wisconsin Supreme Court denied review.

On November 1, 2019, Montour filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. His petition asserts that Frost provided ineffective assistance of counsel by failing to pursue the lesser-included offense of first-degree recklessly endangering safety, which Montour claims was "the only reasonable defense to the charge" of attempted first-degree intentional homicide. Dkt. No. 1 at 3. As framed in Montour's briefing, "the issue is whether trial counsel performed deficiently *by failing to argue altogether* for the lesser-included offense." Dkt. No. 61 at 4 (emphasis in original).

**LEGAL STANDARD**

Montour's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, which limits the power of federal courts to grant writs of habeas corpus based on claims that were adjudicated on the merits by a state court. Under AEDPA, a federal court may grant habeas relief when a state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" United States Supreme Court decisions, or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d); *see also Woods v. Donald*, 575 U.S. 312, 315 (2015).

A state court decision is "contrary to . . . clearly established Federal law" if the court did not apply the proper legal rule, or, in applying the proper legal rule, reached the opposite conclusion as the Supreme Court would have on "materially indistinguishable" facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court's decision is an unreasonable application of

established precedent when that state court applies Supreme Court precedent in "an objectively unreasonable manner." *Id.* This is, and was meant to be, an "intentionally" difficult standard to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Montour's sole ground for relief is premised upon ineffective assistance of counsel. "The benchmark for judging any claim of ineffective assistance of counsel must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon has having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. If a petitioner fails to make a showing on either component, then the results of the trial cannot be said to be unreliable. *Id.*

To show deficient performance, Montour must demonstrate "that counsel's representation fell below an objective standard of reasonableness" and must take into account the "wide latitude counsel have in making tactical decisions." *Id.* at 688–89 (citation omitted). And this Court's "scrutiny of counsel's performance must be highly deferential." *Id.* at 689. To demonstrate prejudice, "[i]t is not enough for [Montour] to show that the errors had some conceivable effect on

the outcome of the proceeding . . . and not every error that conceivably could have influenced the outcome undermines the reliability of the proceeding." *Id.* at 693. Based on the totality of the evidence, Montour must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694–95. Where, as here, a petitioner asserts ineffective assistance counsel in the context of a habeas corpus proceeding, federal courts engage in "doubly deferential review under AEDPA." *Minnick v. Winkleski*, 15 F.4th 460, 468 (7th Cir. 2021) (quoting *Wilborn v. Jones*, 964 F.3d 618, 620 (7th Cir. 2020) (internal quotation marks omitted). "Deference is layered upon deference in these cases because federal courts must give 'both the state court and the defense attorney the benefit of the doubt.'" *Id.* (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)).

## ANALYSIS

### A. Whether the State Court's Adjudication Was Based on an Unreasonable Determination of the Facts

Montour begins by arguing that the state court made an unreasonable factual finding when it stated that he and Frost "wanted a speedy trial because they believed that the State's witnesses had credibility issues." *Montour*, 384 Wis. 2d 271, ¶ 6. He asserts that this was an unreasonable conclusion because Frost's strategy was not developed on the basis of witness credibility but rather witness *availability*. Montour further argues that the Wisconsin Court of Appeals compounded this error when it relied on the factual finding to assess Frost's performance. *See id.* at ¶ 11 ("Given the state of the evidence before trial, *including the somewhat shaky witness testimony* . . . counsel made a reasonable decision to employ an 'all or nothing' strategy throughout the trial." (emphasis added)).

"A finding of fact . . . is not unreasonable simply because a federal habeas court would have reached a different conclusion." *Hicks v. Hepp*, 871 F.3d 513, 525 (7th Cir. 2017) (internal

citation omitted). Rather, Montour must rebut the Wisconsin Court of Appeals' factual findings by "clear and convincing evidence." *Id.* (internal citation and quotation marks omitted). To support his position, Montour makes much of the fact that Frost repeatedly indicated that she was operating on the belief that the State's witnesses would not show up at trial. But Montour fails to recognize that Frost stated that her belief regarding availability of witnesses was only "part of" her strategy. *Id.* In formulating her strategy, Frost also considered the "nature and character" of the State's witnesses and how she anticipated they may act on the stand in the event the State was able to locate them. Dkt. No. 34-12 at 24:04. True, Frost cited her belief that the State's witnesses would not show up, but there is evidence in the record that also supports the conclusion that Frost's strategy was, at least in part, based on her assessment of the credibility of the State's potential witnesses. As she testified at the postconviction motion hearing, Frost viewed the case as "a great case for trial," a view that the trial court shared. *Id.* at 47:03–04; Dkt. No. 34-13 at 13:21–14:02. Frost noted that her assessment was also based upon her view of the prosecutor's trial skills and his potential for alienating the jury. *Id.* at 47:09–18. Montour has failed to rebut the state court's factual findings by clear and convincing evidence.

**B. Whether the Wisconsin Court of Appeals Unreasonably Applied *Strickland***

The Wisconsin Court of Appeals' decision describes the trial court's factual findings extensively but provides only a brief analysis of the merits of Montour's ineffective assistance of counsel claim. Its explanation consists of a single paragraph:

> Applying the law governing deficient performance to the circuit court's findings and considering the foregoing, we conclude that counsel did not perform deficiently. Trial counsel developed and pursued a strategy that Montour was not the shooter. Montour chose to pursue that strategy while withholding crucial information that undermined that strategy. Montour argues that the way the evidence came in necessitated a strategy change. As is clear from the record, the strategy issues arose because Montour belatedly informed his counsel that he was the shooter. "[A] defendant cannot create his own error by deliberate choice of

> strategy and then ask to receive benefit from that error on appeal." *State v. Gary M.B.*, 2004 WI 33, ¶ 11, 270 Wis. 2d 62, 676 N.W.2d 475 (citation omitted).

*Montour*, 384 Wis. 2d 271, ¶ 16.

It is clear that the Wisconsin Court of Appeals applied *Strickland*. *Id.* at ¶¶ 13–16. Therefore, the only question for this Court to decide is whether the Wisconsin Court of Appeals did so reasonably. In order for the Wisconsin Court of Appeals' decision to be an unreasonable application of *Strickland*, it must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam) (internal quotation marks and citation omitted). Because there are "countless ways to provide effective assistance in any given case," *Strickland*, 466 U.S. at 689, "the range of reasonable applications [of *Strickland*] is substantial." *Harrington*, 562 U.S. at 105. The question "is not whether counsel's actions were reasonable" but whether there is "any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*[1]

Montour asserts that his trial counsel provided constitutionally ineffective assistance in failing to pursue the lesser included offense of recklessly endangering safety. The Seventh Circuit has recognized that "[s]trategic choices are 'virtually unchallengeable.'" *McAfee v. Thurmer*, 589 F.3d 353 (7th Cir. 2009) (quoting *Strickland*, 466 U.S. at 690). Here, there is a reasonable argument that Frost satisfied the *Strickland* standard. Armed with the knowledge that the State may have difficulty locating its witnesses and that, even if they were located, they may have questionable credibility, Frost and Montour pursued a speedy trial with their theory of defense centered on the idea that Montour was not the shooter. After the State's witnesses appeared and identified Montour as the shooter, Montour disclosed to Frost that he was the shooter but that he

[1] *Harrington* also cautions the Court to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." 562 U.S. at 105

only intended to scare, not kill, Kruizenga and Valadez. Faced with this sudden revelation, Frost had to choose whether to make a fundamental change in her trial strategy and argue for the lesser-included offense, nearly guaranteeing that Montour would be convicted, or move forward with her existing theory that Montour was not the shooter and seek acquittal. Believing that the trial would "be over" if Montour testified to his intent, she advised Montour not to exercise his right to testify and continued to pursue the theory that he was not the shooter. Dkt. No. 34-12 at 37:8–10.

Frost's fear that conviction of the charged crimes was likely if the jury concluded Montour was the shooter was not unreasonable. Kruizenga had testified that Montour had fired six to seven shots directly at him. Kruizenga testified that the car in which Montour was riding was only ten to fifteen feet away and he "could see down" the barrel of the gun as Montour shot at him. Dkt. No. 34-9 at 98:04–09. Adrian Valadez likewise testified that there were four to six shots and that he saw Montour point the gun in his direction. *Id.* at 151:15–52:08. True, Frost could have argued that the fact that Kruizenga was struck in the lower leg and that the only bullet recovered appeared to have struck the lower part of the back door to the bar suggests that the shooter was not intending to kill. But the first shots were fired before Kruizenga and Valadez fled back into the bar, and only one bullet and a possible fragment were ultimately found. The investigating officer testified about the difficulties of locating bullets at the scene and of hitting a target from a moving vehicle. Dkt. No. 34-10 at 43:11–19; 60:20–61:13. Given this evidence, it was not unreasonable for Frost to focus in her closing on the State's argument that Montour was the shooter.

This may be a case that, "[i]n hindsight, it might well have been better to urge the jury to convict on the lesser-included offense, rather than go for broke by seeking an acquittal on the more serious charge." *McAfee*, 589 F.3d at 356. But as the court noted in *McAfee*, "we do not second-guess an attorney's performance with the benefit of hindsight. Instead, as *Strickland* dictates, we

make 'every effort . . . to evaluate the conduct from counsel's perspective at the time.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). While several witnesses identified Montour as the shooter, Frost did not stand idly by and do nothing to rebut this testimony. During closing arguments, Frost highlighted various inconsistencies in the stories among those who testified, including differences in where the gun was when it was fired, whether Kruizenga and Valadez split up or ran in the same direction following the shooting, what the car looked like, and what color it was. She also emphasized that there was only one individual who testified that wasn't under the influence of alcohol that night. Finally, Frost noted the tension among the victims and Montour, implying that the victims would have had a motive to identify Montour as the shooter based on their prior acrimonious interactions. Her argument "might well have swayed a few jurors and forced a compromise verdict—not guilty of intentional homicide but guilty on the lesser-included offense." *Id.*

Citing *United States ex rel. Barnard v. Lane*, Montour argues that Frost's failure to argue for the lesser-included offense and decision to pursue an all-or-nothing defense left him "with no defense at all." 819 F.2d 798, 803 (7th Cir. 1989). But unlike this case, *Barnard* was not governed by AEDPA. Moreover, in *Barnard*, the defendant was charged with murder, and his trial counsel failed to request a jury instruction on justification and manslaughter, even in the face of the defendant's admission that he shot the victim and the jury's clear reluctance to find the defendant guilty of murder. *Id.* at 803–04. Here, the trial court instructed the jury on the lesser included offense of first-degree recklessly endangering safety and specifically told the jury that it should consider the lesser charge if it was unable to agree on the more serious charge. Montour was not left without any defense. Unlike counsel in *Barnard*, Frost's strategy was not to abandon Montour's only defense "in the hope that a jury's sympathy [would] cause them to misapply or

ignore the law they [were] sworn to follow." *Id.* at 805. Instead, Frost formulated and persisted with the theory that Montour was not the shooter and presented evidence and closing argument to support that theory—the mere fact that she chose not to highlight the lesser-included offense, which might have undercut her case for acquittal, does not automatically render her performance deficient.

Finally, even if the Court were to conclude that the Wisconsin Court of Appeals unreasonably applied *Strickland* in concluding that Frost's performance was not constitutionally deficient, Montour would still have to establish prejudice. Because the Wisconsin Court of Appeals did not reach the issue of prejudice, the Court reviews it *de novo*. *See Dunn v. Jess*, 981 F.3d 582, 595 (7th Cir. 2020). To demonstrate prejudice, Montour must show, based on the totality of the evidence, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694–95. "This does not require a showing that counsel's actions more likely than not altered the outcome," but the likelihood of a different result must be "substantial, not just conceivable." *Harrington*, 562 U.S. at 111–12 (internal quotation marks and citations omitted).

Unlike many other habeas cases involving lesser-included offenses, the jury in this case received instructions on the lesser-included offense and considered it during its deliberations. Thus, the jury could have found Montour guilty of first-degree recklessly endangering safety had it entertained doubt on the more serious charge. It did not. Montour argues that, had Frost presented closing argument with respect to the lesser-included offense, there is a reasonable probability that the jury would have instead convicted him of that charge. To support this argument, Montour asserts that Frost should have summarized the following evidence for the jury during closing arguments: (1) Officer Mair testified that an individual would fire at someone's

"center mass," such as the chest, if he wished to use deadly force; (2) a ballistics expert testified that bullets typically travel in a straight line from whatever direction the barrel is pointed in; and (3) bullet damage found on the back door of the bar was low to the ground and Kruizenga's bullet wound was located slightly above his ankle. According to Montour, if summarized appropriately during her closing, Frost would have been able to argue that Montour lacked the intent to kill Kruizenga and Valadez because the evidence demonstrated that he fired at the ground, not at Kruizenga or Valadez's center mass. Had the evidence been presented and argued in this way, Montour asserts that there "is a reasonable probability that the jury would have had reasonable doubt regarding the attempted first-degree intentional homicide charge," and the jury would have instead returned a verdict on the lesser-included offense. Dkt. No. 61 at 20.

But Montour fails to account for the counterarguments that the State could have advanced. For one, the State argued during its initial closing argument that "you do not fire a handgun at another human being from ten feet away with any other intention than to kill them." Dkt. No. 34-11 at 93:17–25. Furthermore, Montour's argument ignores the testimony of both Kruizenga and Adrian Valadez that he shot directly at them when they were standing outside the bar and assumes that Montour is an accurate shot. Because Kruizenga was struck in the lower leg and at least one of the bullets appears to have struck the lower part of the screen door, Montour argues that the jury would likely have found he was aiming low. But it is just as plausible that Montour missed due to the difficulty of firing a handgun from a moving vehicle as his targets were fleeing into the bar.

Montour also ignores the fact that the jury heard the evidence he wished Frost had summarized. His argument is essentially that, had Frost offered the argument he now wishes she had given, the jury would have convicted Montour on the charge of first-degree recklessly endangering safety instead of attempted first-degree intentional homicide. *See* Dkt. No. 61 at 20.

But the jury had all of the evidence he believes it needed to acquit him of attempted first-degree intentional homicide. Put simply, while an argument for the lesser-included offense may raise the *possibility* that the jury would have convicted Montour on that charge, the mere recapping of evidence at closing argument does not create a *reasonable probability* that the jury would have done so. In other words, while it is conceivable that the jury may have chosen to convict Montour on the lesser-included offense, Montour has not shown that the likelihood of a different result is "substantial." *Harrington*, 562 U.S. at 111–12 (internal quotation marks and citations omitted). Therefore, Montour has failed to demonstrate prejudice.

**CONCLUSION**

For the foregoing reasons, Montour's petition for writ of habeas corpus (Dkt. No. 1) is **DENIED**. The Clerk is directed to enter judgment dismissing the case. Because reasonable jurists could reach a contrary decision, however, a certificate of appealability will be granted on the issue of whether Montour's trial attorney was ineffective.

Montour is advised that the judgment entered by the Clerk is final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4.

**SO ORDERED** at Green Bay, Wisconsin this 21st day of July, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge